WO                                                                                                          KAB

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Dewayne Outley, Jr., | No. CV 21-00084-PHX-JAT (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Michael Dewayne Outley, Jr., who is currently confined in the Red Rock Correctional Center (RRCC), filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. (Doc. 1.) Before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 4).

**I.   Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a First Amendment claim against Defendants Shinn, the Director of the Arizona Department of Corrections (ADC), and Stolc, the Warden of RRCC, solely in their official capacities based on the ADC's telephone policy, which is implemented at RRCC. (Doc. 6.) The Court dismissed the remaining claims and Defendants. (*Id.*)

**II.   Motion for Preliminary Injunction**

In his Motion, Plaintiff asserts that his rights to "freedom of expression" and "intimate association" are burdened due to RRCC's telephone policy requiring Plaintiff to get pre-approval prior to placing phone calls and only allowing Plaintiff to place two phone

calls per day. (Doc. 4.) Plaintiff asserts that he does not possess addresses of his friends and family and will not be able to comply with RRCC's policies, which "essentially bar[s]" him from placing calls. (*Id.* at 2.) Plaintiff asserts that he should be permitted to place "unlimited phone calls" and that RRCC will suffer "no type of safety or monetary hardships" if he is permitted to do so. (*Id.* at 4.)

As relief, Plaintiff seeks an order: (1) preventing RRCC from requiring prior approval for Plaintiff to place calls; (2) preventing RRCC from limiting Plaintiff to two calls per day; and (3) preventing RRCC from limiting Plaintiff to receiving "secure packages" from parties on a pre-approved list.

In response, Defendants assert that the telephone policy does not violate Plaintiff's First Amendment rights because there are legitimate governmental interests for the policy and Plaintiff has alternative means of exercising his First Amendment rights.

**A.  The Policy and Asserted Interests in the Policy**

Defendants support their Response with the following facts. Red Rock Correctional Center (RRCC) is owned and operated by CoreCivic. At all times relevant to the Complaint, RRCC incarcerated ADC prisoners pursuant to a correctional services agreement between ADC and CoreCivic. (Doc. 13-1 at 2 ¶ 3.) RRCC is a medium-custody facility that houses approximately 1950 prisoners. (*Id.* at 3 ¶ 9.) Prisoners are afforded privileges consistent with their custody level classification and phase. (*Id.* ¶ 10.) A prisoner's custody level classification is based on their security risk. (*Id.* ¶ 11.) The process for determining a prisoner's custody level classification considers their behavior and other objective factors that are available and relevant, such as the risk the prisoner presents to the public, staff, and other prisoners. (*Id.*)

Prisoners classified as medium custody are those who represent a moderate risk to the public and staff. (*Id.* ¶ 12.) These prisoners are not permitted to work outside the secure perimeter of an institution and require controlled movement within the institution. (*Id.*)

In addition to a prisoner's custody level, prisoners are assigned phases through the

Earned Incentive Program ("EIP").  (*Id.* at 4 ¶ 13.)  The EIP is a three-phase system of graduated, earned incentives and sanctions to assist prisoners in learning and sustaining a responsible, pro-social lifestyle and to incorporate ethics and values into their everyday lives.  (*Id.*)  The EIP also enhances the safety and security of the facility by providing incentives to prisoners based on their positive behavior.  (*Id.*)

The third phase of the EIP affords prisoners the most privileges, the second phase affords prisoners moderate privileges, and the first phase affords prisoners the fewest privileges.  (*Id.* ¶ 14.)  EIP programming includes: academic and career and technical education; substance abuse and sex offender education and treatment; and self-improvement (e.g. cognitive restructuring and re-entry).  (*Id.*)  Prisoners receive EIP incentives to participate in the program based on the prisoner's EIP phase level.  (*Id.* ¶ 16.)  These incentives include, but are not limited to: regular visitation, holiday visitation, and food visitation; the allowable amounts for telephone calls; and the allowable property and spending limitations for the store. (*Id.*)

A medium-custody prisoner at Phase II receives two 15-minute calls per day.  (*Id.* ¶ 17.)  A medium-custody prisoner at Phase III receives five 15-minute calls per day.  (*Id.*)  To receive the privilege of unlimited calls per day, a prisoner must be classified at the minimum custody level and achieve Phase III of the EIP.  (*Id.*)

Further, a medium-custody prisoner at Phase II may receive a Secure Package once every other month.  (*Id.* at 5 ¶ 18.)  A Secure Package is one that is ordered directly from an approved vendor and must comply with requirements for allowable and authorized property.  (*Id.*)  To receive the privilege of receiving one Secure Package a month, a prisoner must achieve Phase III of the EIP.  (*Id.*)

Department Order (DO) 915 is the ADC policy for Prisoner Telephone Calls.  (*Id.* ¶ 19.)  RRCC follows and enforces DO 915 among the prisoner population.  (*Id.*)  Pursuant to DO 915, prisoners are afforded restricted access to telephones consistent with their security classification, their EIP phase, and within the physical limits of the institution.  (*Id.* ¶ 20.)  The frequency of telephone calls for each prisoner varies depending on their security

classification and phase in the EIP. (*Id.* ¶ 21.) Only approved individuals on a prisoner's visitor list are authorized as recipients of prisoner telephone calls. (*Id.*)

Telephone calls are limited to the same individuals (maximum of 20) approved for visitation. (*Id.* ¶ 23.) The visitor list is maintained in the prisoner's visitation file. (*Id.* ¶ 24.) During processing, background checks on the individuals on the visitor list are conducted. (*Id.* ¶ 25.) The background checks include a review of the individual visitor's criminal history and warrant checks. (*Id.*) Background checks take approximately 30 days to complete. (*Id.* ¶ 26.) A third-party vendor processes the background checks. (*Id.*)

ADC asserts that the purpose of these background checks is to enhance the safety and security of the facility and to protect the general public against potential crime that might occur if there were no restrictions regarding the visitor list. (*Id.* at 6 ¶ 27.) Prior to approval, the accuracy of telephone numbers, the individuals, and the stated relationship is verified. (*Id.*)

Although DO 915 generally requires prisoners to schedule personal telephone calls in advance using a sign-up request and based on the facility's telephone call schedule, it also gives the Wardens and Deputy Wardens the discretion to develop telephone schedules that are conducive to the unit operational clock and the available telephones at their institution. (*Id.* ¶ 29.) At RRCC, prisoners are not required to schedule use of the telephones for personal telephone calls. (*Id.* ¶ 30.) RRCC houses 1950 prisoners on average (with a max capacity of 2000), and has approximately 200 telephones on site. (*Id.*) Of the 200 telephones, there are 6 telephones per dayroom. (*Id.*) Each dayroom houses a maximum of 60 prisoners. (*Id.*)

When speaking to an approved individual on the telephone, the prisoner is permitted to speak to other members within that household as well. (*Id.* ¶ 31.) For example, if a prisoner's parent is listed as approved and he/she has a conversation with their parent, they may speak to other members within their parent's household. (*Id.*)

In addition to the ability to communicate by telephone, prisoners may utilize traditional mail and the facility's tablet messaging system, which allows for email

communications with friends and family.  (*Id.* ¶ 32.)

Pursuant to the CARES Act, prisoners receive two free 15-minute calls per week.  (*Id.* ¶ 33.)  Plaintiff and all other prisoners permitted to use the telephone, may utilize their two free telephone calls per week by contacting an individual on their approved visitor/call list pursuant to the CARES Act.  (*Id.* ¶ 36.)

As of November 9, 2020, Plaintiff utilized his two free calls per week to call his father, who is on his approved visitor/call list.  (*Id.* ¶ 37.)  From November 9, 2020 to March 10, 2021, Plaintiff received 45 free calls.  (*Id.* ¶ 38.)

There is no limitation on the amount of mail a prisoner may receive regardless of custody, provided that the incoming mail meets requirements, does not violate policy, and the mail is not between the prisoner and individuals including, but not limited to, released offenders currently under community supervision (excluding immediate family members), minors that are not the prisoner's natural or adopted child or minors that do not have parents' or guardians' prior written approval, and current or former department/private prison employees and/or current or former department volunteers (for a period of two years).  (*Id.* ¶ 39.)

Additionally, prisoners may communicate using the tablet messaging system available on the tablet that each eligible prisoner receives.  (*Id.* ¶ 40.)  Tablets are authorized for all ADC prisoners housed in the ADC or a contract facility, including RRCC, excluding prisoners under watch status, who are assigned to reception centers, have demonstrated destructive behavior involving a tablet or kiosk within the past 12 months, are not compliant with the integrated housing program, or who are assigned to detention units pending transfer to close custody management, restrictive housing, or enhanced security.  (*Id.* at 8 ¶ 41.)  Tablets enable prisoners to access several applications, including but not limited to: email application, which enables prisoners to send and receive photo attachments and video gram messages; ecards, a digital version of a greeting card, utilized for the exchange between friends and family and the prisoner; and video visitation.  (*Id.* ¶ 42.)

Prisoners can use the email and ecard applications to correspond with anyone. (*Id.* ¶ 43.) Individuals with whom prisoners correspond using these applications do not need to undergo a background check or any other approval. (*Id.*) Prisoners are also not limited by the number of individuals they can correspond with, so long as the individual registers as an active customer of the vendor contracted to provide the service. (*Id.*)

Plaintiff was admitted to RRCC on October 13, 2020. (*Id.* ¶ 44.) Plaintiff is a medium-custody prisoner at Phase II of the EIP. (*Id.* at 9 ¶ 45.) Therefore, he receives privileges afforded to Phase II prisoners, including the opportunity to make two telephone calls per day and to receive one secure package every other month. (*Id.*) Secure packages are packages sent from an approved vendor. (*Id.* ¶ 46.) Individuals on the prisoner's approved visitor/call list may send the prisoner secure packages from approved vendors. (*Id.*) Secure packages may not be sent from a non-approved vendor. (*Id.*)

Approved vendors are vendors that are specifically contracted with the facility for the ordering, processing, and sending of packages ordered by prisoners or their friends and family. (*Id.* ¶ 47.)

To receive the maximum of five telephone calls per day, Plaintiff must achieve Phase III of the EIP. (*Id.* ¶ 48.) Phase III will grant him the privilege of five 15-minute calls per day. (*Id.*) To receive one secure package per month, Plaintiff must achieve Phase III of the EIP. (*Id.* ¶ 49.) Plaintiff has not yet completed the programs for graduation to Phase III, and is not participating in the programs. (*Id.* ¶ 50.) Although Plaintiff has not received secure packages since arriving at RRCC, the privilege is available to him. (*Id.* ¶ 51.) Further, his custody and EIP phase do not prevent him from communicating by telephone with individuals on his approved visitor list, or from using either traditional mail or the prisoner messaging system to correspond with anyone not on his approved visitor list. (*Id.*)

Additionally, since arriving at RRCC on October 13, 2020, Plaintiff has not requested more than two individuals be added to his visitor/call list. (*Id.* at 10 ¶ 52.) The two individuals that Plaintiff requested be added to his visitor/call list have been approved.

(*Id.* ¶ 53.)  In addition to corresponding with his father on the telephone, Plaintiff utilizes the tablet messaging system to correspond with his friends and other family members regularly.  (*Id.* ¶ 54.)  He also has traditional mail available to him, and has utilized it to send non-legal mail.  (*Id.*)  For example, as of March 23, 2021, Plaintiff has utilized the tablet messaging system to send 375 emails and to receive 410 emails, including images.  (*Id.* ¶ 55.)  He corresponds with five individuals, including his family members.  (*Id.*)  Most of these individuals are not on his approved visitor/call list (as no prior approval is needed for email correspondence).  (*Id.*)

Individuals who have an extensive criminal history, are affiliated with a Security Threat Group (STG), or who are known to engage in criminal activity are not approved to be on the prisoner's visitor call list.  (*Id.* at 47 ¶ 29.)  Prior to approval, the accuracy of telephone numbers, the individual, and the stated relationship are verified and the caller must give approval to receive calls from the prisoner.  (*Id.* ¶ 31.)  Defendants assert that conducting a background check on a potential caller promotes safety and security by preventing the prisoner from calling a victim, individuals with criminal histories, or individuals associated with a STG.  (*Id.* ¶ 33.)

### B.     Legal Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  A plaintiff seeking a *mandatory* preliminary injunction must show that (1) the facts and law clearly favor the plaintiff, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *See Winter*, 555 U.S. at 20; *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted) (discussing the heightened burden when a *mandatory* preliminary injunction is sought).

The movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**C.   Discussion**

In examining regulations that restrict communications with prisoners, a court must first determine whether any First Amendment interest is implicated. *Hrdlicka v. Reniff*, 631 F.3d 1044, 1048-49 (9th Cir. 2011) (citing the two-step analysis in *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989)). If such an interest is implicated, the court must apply the four-factor *Turner* test to decide whether that interest gives rise to a protected First Amendment right. *Hrdlick*, 631 F.3d at 1048; *Thornburgh*, 490 U.S at 408.

The Ninth Circuit Court of Appeals has defined the First Amendment right at issue as the right to communicate with persons outside prison walls and has identified use of a telephone as a *means* of exercising this right. *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir.2002); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir.1996), *amended*, 135 F.3d 1318 (9th Cir. 1998); *Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir. 1986); *see also Halvorsen v. Baird*, 146 F.3d 680, 689 (9th Cir. 1998) (pretrial detainee).

Having defined the constitutional right at issue, the Court next considers whether the restrictions on Plaintiff's telephone usage violate the right. *Valdez*, 302 F.3d 1048-49. A prison regulation that impinges on a prisoner's constitutional right "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). In making the "reasonableness" inquiry, the Court considers the four factors articulated in *Turner*: (1) whether there is a valid, rational connection between the restriction and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether accommodating the asserted

constitutional right will have a significant negative impact on prison guards and other prisoners, and on the allocation of prison resources generally; and (4) whether there are obvious, easy alternatives to the restriction showing that it is an exaggerated response to prison concerns. *Id.* at 89-90.

Regulations prohibiting certain communications are valid despite the unquestioned First Amendment interest if the *Turner* factors are met. *Hrdlick*, 631 F.3d at 1048; *Thornburgh*, 490 U.S at 408.

With regard to Plaintiff's argument that his First Amendment rights are violated if he is not given "unlimited calls per day," Defendants have shown that they have rehabilitative and security-related reasons for limiting prisoners at Plaintiff's custody level to two calls per day and that Plaintiff has alternative means of communicating with individuals outside of prison, including by email and regular mail. Plaintiff has made no showing that the limitation of phone calls per security level is an exaggerated response to prison concerns. On this record, the Court cannot conclude that the facts and law clearly favor Plaintiff as to his contention that his First Amendment rights will be violated unless he is allowed "unlimited" phone calls.

Likewise, although Plaintiff argues that the Court should prevent RRCC from limiting Plaintiff to receiving "secure packages" from parties on a pre-approved list, Plaintiff simply makes the conclusory assertion that the policy regarding secure packages violates his constitutional rights, but the Court cannot conclude from this assertion that the facts and law clearly favor Plaintiff.

Plaintiff presents some evidence suggesting that the policy requiring a background check on an individual before a prisoner can call that individual is an exaggerated response to the security concerns at issue. Plaintiff asserts that the following measures are already in place to allay the security concerns provided by Defendants: (1) all calls are recorded and monitored; (2) prior to placing a call, Plaintiff must state his full name and enter his ADC inmate number, (3) if an individual wants to accept a call from a prisoner, they must prepay for an account through ICS Solutions, and (4) any individual a prisoner calls is

given the opportunity to deny the call or permanently block any calls before the call will go through. (Doc. 4 at 14.)

Here, the question of whether background checks for phone calls are an exaggerated response to the identified security interests is necessarily fact specific, and there are questions going to the merits that counsel hesitation before the Court renders an opinion as to the application of the *Turner* factors. *See, e.g.*, *Beaulieu v. Ludeman*, 690 F.3d 1017, 1038–40 (8th Cir. 2012) ("In the prison context, we have concluded that 'the extent of inmates' First Amendment right to communicate with the outside world is a fact-intensive universe.'") (quoting *Holloway v. Magness*, 666 F.3d 1076, 1079 (8th Cir. 2012); *Pell v. Procunier*, 417 U.S. 817, 827–28 (1974) (Considerations of security and rehabilitation "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. . . . [W]hen the issue involves a regulation limiting one of several means of communication by an inmate, the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation.").

Here, Plaintiff has not met his burden of showing that the law and facts *clearly favor* his position. *See Pell*, 417 U.S. at 828 (holding that in light of "the alternative channels of communication that are open to prison inmates, a restriction on one manner in which prisoners can communicate with persons outside of prison was not unconstitutional as long as the restriction operates in a neutral fashion, without regard to the content of the expression, falls within the 'appropriate rules and regulations' to which 'prisoners necessarily are subject,' and does not abridge any First Amendment freedoms retained by prison inmates.") (internal citations omitted).

Moreover, the Court is not persuaded by Plaintiff's argument that he suffers irreparable harm because he cannot obtain addresses of those individuals he wishes to call. There is no showing that this difficulty, which is particular to Plaintiff, would render an

otherwise reasonable regulation unreasonable because of Plaintiff's particular circumstances. *See, e.g.*, *Coronel v. State of Hawaii, Dep't of Corr.*, 993 F.2d 882 (9th Cir. 1993) (where prisoner could not make calls to his wife during regular hours because she was at work and her employer would not let her accept personal calls and the regulation was reasonable under the *Turner* factors, Plaintiff's particular situation with his wife did not render it unreasonable because "[p]rison officials are not required to set up and then shoot down 'every conceivable alternative method of accommodating the constitutional complainant'") (internal citation omitted).

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction will be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Preliminary Injunction (Doc. 4).

(2) Plaintiff's Motion for Preliminary Injunction (Doc. 4) is **denied**.

Dated this 3rd day of June, 2021.

James A. Teilborg
Senior United States District Judge