WO

KAB

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Dewayne Outley, Jr., <br> Plaintiff, <br> v. <br> David Shinn, et al., <br> Defendants. | No. CV 21-00084-PHX-JAT (JFM) <br><br> **ORDER** |

Plaintiff Michael Dewayne Outley, Jr., who was formerly in the custody of the Arizona Department of Corrections (ADC), brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 43.) Defendants move for summary judgment (Doc. 53), and Plaintiff did not respond.[1]

**I.   Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment claims against ADC Director David Shinn and Red Rock Correctional Center (RRCC) Warden Bruno Stolc, in their individual and official capacities. (Docs. 29, 42.) The Court dismissed the remaining claims and Defendants. (*Id.*)

In his First Amended Complaint, Plaintiff relevantly alleged as follows. Pursuant to the ADC's policy regarding "Inmate Telephone Access," Plaintiff is only permitted to place telephone calls to people who are also on his "visitor list," which requires that the

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response. (Doc. 55.)

individuals who receive calls undergo a background check. Plaintiff asserts that this is an exaggerated response to the ADC's security concerns because there are already significant safeguards in place to alleviate security concerns regarding telephone calls. (Doc. 43.) Plaintiff also alleges that only people on the approved visitor list may order him packages from a vendor pre-approved by the RRCC and this is likewise an exaggerated response to alleged security concerns because all packages come from the pre-approved vendor and are searched by security when they enter the prison. (*Id.*)

Defendants argue that they are entitled to summary judgment because Plaintiff's claims for injunctive relief are moot due to his release from prison, Defendants were not personally involved in any alleged deprivation of Plaintiff's constitutional rights, Defendants are entitled to qualified immunity, and Defendants did not violate Plaintiff's First Amendment rights.

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Facts[2]

RRCC is owned and operated by CoreCivic and houses ADC inmates pursuant to a correctional services agreement with CoreCivic, Inc. (Doc. 54 ¶ 1.) Plaintiff was housed at RRCC from October 13, 2020 to December 2, 2021. (*Id.* ¶ 2.)

ADC inmates are afforded telephone and package privileges consistent with their custody level classification and phase. (*Id.* ¶ 4.) An inmate's custody level classification is based on their security risk. (*Id.* ¶ 5.) The process for determining an inmate's custody level classification considers their behavior and other objective factors that are available and relevant, such as the risk the inmate presents to the community, staff, and other inmates. (*Id.*) Inmates classified as medium custody are those who represent a moderate risk to the community and staff. (*Id.* ¶ 6.) These inmates are not permitted to work outside the secure perimeter of an institution and require controlled movement within the institution. (*Id.*)

In addition to an inmate's custody level, inmates are assigned phases through the

---

[2] Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendants' supported facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified First Amended Complaint or other evidence on the record. Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

Earned Incentive Program (EIP). (*Id.* ¶ 7.) The EIP is a three-phase system of graduated earned incentives and sanctions to assist inmates in learning and sustaining a responsible, prosocial lifestyle and to incorporate ethics and values into their everyday lives. (*Id.*) The EIP is a behavior modification program, which the ADC maintains enhances the safety and security of the facility by providing incentives to inmates based on their positive behavior. (*Id.*) The third phase affords inmates the most privileges, the second phase affords inmates moderate privileges, and the first phase affords inmates the fewest privileges. (*Id.* ¶ 8.) EIP programming includes: academic and career and technical education; substance abuse and sex offender education and treatment; and self-improvement (e.g. cognitive restructuring, re-entry). (*Id.* ¶ 9.)

Inmates receive EIP Incentives to participate in the program. (*Id.* ¶ 10.) These incentives include, but are not limited to: (1) Inmate Visitation: frequencies for regular visitation, holiday visitation and food visitation are based on EIP Phase Level; (2) Inmate Telephone Calls: the allowable amounts for telephone calls shall be based on the inmate's EIP Phase level; and (3) Inmate Property: the allowable property and spending limitations for store. (*Id.*)

A medium-custody inmate at Phase II receives two 15-minute calls per day. (*Id.* ¶ 11.) A medium-custody inmate at Phase III receives five 15-minute calls per day. (*Id.*) To receive the privilege of unlimited calls per day, an inmate must be classified at the minimum custody level and achieve Phase III of the EIP. (*Id.*) Further, a medium-custody inmate at Phase II may receive a Secure Package once every other month. (*Id.* ¶ 12.) A Secure Package is one that is ordered directly from an approved vendor, who is a neutral party. (*Id.*) The Secure Package must comply with requirements for allowable and authorized property; to receive the privilege of receiving one secure package a month, an inmate must achieve Phase III of the EIP. (*Id.*) Secure packages must be ordered and received directly from the vendor to prevent the introduction of contraband (such as drugs, cell phones, and weapons) into the facility. (*Id.* ¶ 13.) The frequency of how often an inmate may receive a secure package is dependent on EIP phase and custody level due to

security concerns. (*Id.*) Low or medium custody inmates on the highest EIP tier generally pose a lower risk to the facility, staff, and other inmates, while inmates at higher custody levels or lower EIP tier levels pose a greater risk. (*Id.*) Therefore, inmates who pose a lower risk are permitted to receive more secure packages and those who pose a greater risk. (*Id.*)

Moreover, there are restrictions on the number of packages received by inmates due to security concerns. (*Id.* ¶ 14.) Facility personnel must be able to adequately search packages for contraband as they come into the facility, as well as to aid in cell searches necessary to ensure that contraband is not being hidden in the inmate's property. (*Id.*) The ADC asserts that, as a result of its policies, inmates and staff are provided with a safer environment to live and work. (*Id.*) The ADC asserts that basing the privileges available to inmates on their custody level and EIP status serves to both maintain the safety and security of the facility and to promote rehabilitation among the inmate population. (*Id.* ¶ 15.)

ADC Security Operations Administrator E. Lao testifies that he has seen and is personally aware of hundreds of inmate attempts to perpetuate criminal acts over the phone as well as attempts to introduce dangerous contraband into a facility. (*Id.* ¶ 17.) The ADC asserts that its policies, including its phone and secure package policies, are designed to reduce these issues and to incentivize good behavior among the inmate population. (*Id.*)

Department Order (DO) 915 is an ADC policy for Inmate Telephone Calls and is enforced at RRCC. (*Id.* ¶ 19.) Pursuant to DO 915, inmates are afforded restricted access to telephones consistent with their security classification, their EIP phase, and the physical limits of the institution. (*Id.*) The frequency of telephone calls for each inmate varies depending on their security classification and phase in the EIP. (*Id.* ¶ 21.) Only approved individuals on an inmate's visitor list are authorized as recipients of inmate telephone calls. (*Id.* ¶ 22.) Telephone calls are limited to the same individuals (maximum of twenty) approved for visitation. (*Id.* ¶ 23.) The visitor list is maintained in the inmate's visitation file. (*Id.* ¶ 24.)

During processing, background checks on the individuals on the visitor list are conducted, which include a review of the individual visitor's criminal history and warrant checks consistent with DO 911; the background checks take approximately 30 to 60 days to complete and are processed by a third-party vendor. (*Id.* ¶¶ 25-28.) The background check involves a criminal history and warrant check, which is performed consistent with DO 911, and prior to approval, the accuracy of telephone numbers, the individuals, and the stated relationship is verified. (*Id.* ¶ 29.) If the criminal history background check reveals a warrant for arrest, the Arizona Criminal Justice Information System (ACJIS) shall provide the results to local Criminal Investigations Unit (CIU) for further investigation, and the results of this investigation shall be provided to the Warden or Deputy Warden that requests the background investigation. (*Id.* ¶ 30.)

If the criminal history background investigation reveals a criminal history, the ACJIS operator shall forward all documentation to the unit Deputy Warden, or the Contract Beds Deputy Warden, for review and final decision to approve or deny the application. (*Id.* ¶ 31.) The unit Deputy Warden shall: (1) return approved visitation applications to the Visitation Officer for processing; (2) return all denied visitation applications and copies of denial letters to the Visitation Officer for processing; and (3) destroy all ACJIS related documentation after determining action to be taken. (*Id.*) Background checks are conducted to prevent individuals with a criminal history (including affiliation with a Security Threat Group (STG) from communicating with inmates; otherwise, persons with criminal histories would be able to communicate with inmates and attend visitation, which would then expose facility personnel, inmates, and other visitors to unnecessary danger. (*Id.* ¶ 35.)

It is necessary to verify whether visitors (and thus individuals an inmate will be able to contact by telephone) have any outstanding warrant so a warrant check is conducted to prevent persons of interest from visiting the facility or contacting inmates. (*Id.* ¶ 32.) Absent the requirement for warrant checks, persons of interest would be able to consult with inmates, who may be their accomplices or acquaintances, which would place the

1 safety and security of the facility and public at risk. (*Id.* ¶ 33.)

2 As to telephone calls specifically, the ADC asserts that the requirements mitigate opportunities for inmates to perpetrate crimes, and thus reduce the need to allocate facility resources to addressing these issues internally—such as ongoing monitoring of the phone calls, forwarding the phone calls to the correct justice division, preparing disciplinary reports related to the inmate, and conducting ongoing monitoring of the inmate's activities. (*Id.* ¶ 36.) The Bureau of Prisons (BOP) also requires criminal/parole history from individuals with whom an inmate would like to communicate before the inmate is approved to speak with them. (*Id.* ¶ 41.)

There are no "pre-approval" or background check requirements for an inmate to send or receive mail. (*Id.* ¶ 45.) There is no limitation on the amount of mail an inmate may receive regardless of custody, provided that the incoming mail meets requirements, does not violate policy, and the mail is not between the inmate and individuals including, but not limited to, released offenders currently under community supervision (excluding immediate family members), minors that are not the inmate's natural or adopted child or minors that do not have parents' or guardians' prior written approval, and current or former department/private prison employees and/or current or former department volunteers (for a period of two years). (*Id.* ¶ 46.)

Mailroom staff maintains an itemized list of all incoming and outgoing registered, insured, and certified mails, which contains information such as the date received, inmate name and number, and the date received by the inmate. (*Id.* ¶ 47.) Additionally, designated staff at each unit/complex is authorized to open, inspect and read incoming mail to prevent criminal activity and to prevent inmates from receiving contraband or any other material that may be detrimental to the safe and operation of the institution. (*Id.* ¶ 48.) Upon inspection, incoming mail is withheld from an inmate if it: (1) poses a direct and immediate threat to the security, safety or order of the institution; (2) substantially hinders efforts to treat or rehabilitate the inmate (legal mail is not withheld for this purpose); (3) threatens the intended recipient; (4) promotes, aids or abets criminal activity or violation of

Department rules, including but not limited to rioting, extortion, escape, illegal drug use, conveyance of contraband, solicitation of funds, violence towards others, and promotes or encourages STGs and/or other Criminal Street Gangs; or (5) has contents written in code or that contain hidden messages. (*Id.* ¶ 49.)

Inmates may also communicate using tablet messaging system available on the tablet that each eligible inmate receives. (*Id.* ¶ 52.) Tablet messages are treated similarly to inmate mail, and similar safety and security precautions are used, as identified in further detail below. (*Id.* ¶ 53.) Tablets are authorized for all ADC inmates housed in the Department or a contract facility, including RRCC, excluding inmates under watch status, assigned to reception centers, have demonstrated destructive behavior involving a tablet or kiosk within the past twelve months, are not compliant with the Integrated Housing Program (IHP), are assigned to Detention Units and are pending transfer to close custody management, restrictive housing, or enhanced security. (*Id.* ¶ 54.) Tablets enable inmates to access several applications, including but not limited to: (1) Email Application: enables inmates to send and receive photo attachments and video gram messages; (2) Ecards: a digital version of a greeting card, utilized for the exchange between friends and family and the inmate; (3) Video visitation[3]; (4) Inmate banking inquiry; and (5) Publication resources (e.g., magazines, books, movies, music, and games). (*Id.* ¶55.)

All communications via the tablet are not confidential and are subject to monitoring and recording. (*Id.* ¶ 56.) Mailroom staff are assigned to review incoming and outgoing messages through the facility portal of the inmate tablet system. (*Id.* ¶ 57.) Incoming and outgoing email that has been held for security reasons is reviewed, within three business days, by mailroom staff prior to releasing the email to the inmate. (*Id.* ¶ 58.)]

Secure packages are packages sent from an approved vendor and individuals on the inmate's approved visitor/call list may send the inmate secure packages from approved

---

[3] Video visitation via tablet is permitted for inmates using an approved video visitation kiosk. (*Id.* ¶ 61.) Visitors must be approved through the visitation application process. (*Id.* ¶ 62.)

vendors. (*Id.* ¶ 63.) Approved vendors are vendors that are specifically contracted with the facility for the ordering, processing, and sending of packages ordered by inmates or their friends and family. (*Id.* ¶ 64.) The ADC asserts that allowing individuals without background and warrant checks to send secure packages leads to an additional burden on facility personnel, as personnel would need to be more vigilant about the packages that enter the facility, which would detract from other duties. (*Id.* ¶ 66.)

While in the custody of the ADC, Plaintiff was a medium-custody inmate at Phase II of the EIP, and received privileges afforded to Phase II inmates, including the opportunity to make two telephone calls per day and to receive one secure package every other month. (*Id.* ¶ 68.) His custody and EIP phase did not prevent him from communicating by telephone with individuals listed on his approved visitor list, or from using either traditional mail or the inmate messaging system to correspond with anyone not on his approved visitor list. (*Id.* ¶ 69.) While in the custody of the ADC, Plaintiff requested that two individuals be added to his visitor/call list and those individuals were approved. (*Id.* ¶ 70.) At RRCC, inmates are not required to schedule use of the telephones for personal telephone calls because RRCC houses 1,950 inmates on average, and has approximately 200 telephones on site, including 6 telephones per dayroom (with 60 inmates housed in each dayroom). (*Id.* ¶ 78.) Approximately 30 days after he was admitted to RRCC, Plaintiff placed his first telephone call in which he spent 15 minutes speaking on the telephone. (*Id.* ¶ 74.) Between November 10, 2020 to November 22, 2021, Plaintiff spent just over 17 hours on the telephone. (*Id.* ¶ 75.) (*Id.* at ¶ 77.)

In addition to corresponding with individuals on his approved visitor/call list on the telephone, Plaintiff utilized the tablet messaging system to correspond with his friends and other family members regularly. (*Id.* ¶ 71.) He also had traditional mail available to him and has utilized same to send non-legal mail. (*Id.*) During his time in RRCC custody, Plaintiff utilized the tablet messaging system to send 670 emails and to receive 975 emails, including images; he corresponded with five individuals, including his family members, most of whom were not on his approved visitor/call list (as no prior approval is needed for

email correspondences). (*Id.* ¶¶ 79-80.)

Plaintiff also utilized traditional mail for non-legal purposes; for example, he received a package from the Islamic Bookstore on August 11, 2021 and another package from the Islamic Center Tucson, Inc. on April 30, 2021. (*Id.* ¶ 82.) Plaintiff has not been restricted from receiving secure packages. (*Id.* ¶ 83.) Plaintiff received secure packages on September 7, September 21, October 5, and October 12, 2021, which contained various food items. (*Id.* ¶ 84.)

**IV. Discussion**

**A. Official Capacity Claims**

As an initial matter, Plaintiff's claims against Defendants in their official capacities for injunctive and declaratory relief are now moot because he has been released from ADC custody. "Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) (quoting *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012)). Although there is an exception to the mootness doctrine for claims that are capable of repetition, yet evade review, that exception is limited to cases where the duration of the challenged action is too short to be fully litigated before it ceases, and where there is a reasonable expectation that the plaintiff will be subjected to the same action again. *Alvarez*, 667 F.3d at 1064. The possibility that a prisoner may commit another crime and be returned to custody is too speculative a basis on which to conclude that his claims are capable of repetition. *Id.* at 1064-65. Here, there is no evidence of a non-speculative, reasonable expectation that Plaintiff will again be subject to the ADC's policies.

Likewise, although an exception to mootness has been recognized where a plaintiff is challenging ongoing policies to which others will continue to be subject, the Ninth Circuit Court of Appeals has not extended this exception beyond "short-lived pretrial proceedings in criminal prosecutions, where civil class actions would not be conducive to obtaining the relief sought." *Id.* at 1065. Accordingly, Plaintiff may not obtain injunctive

or declaratory relief in this action, and his official capacity claims against the Defendants will be dismissed.

### B. Defendant Stolc

Plaintiff alleges that Defendant Stolc is individually liable because he is the "final policy maker" of RRCC and "has authority to raise valid policy changes." (Doc. 43.) Defendants assert that Warden Stolc has no authority to promulgate facility policy regarding telephones or packages. (Doc. 54 ¶ 42.) Because there is no evidence that Defendant Stolc was personally responsible for the policies to which Plaintiff objects, there is no evidence that Defendant Stolc had authority to change the policies, and there is no evidence of Defendant Stolc's personal involvement in any alleged violation of Plaintiff's constitutional rights, summary judgment will be granted in favor of Defendant Stolc.

### C. Defendant Shinn

Defendant Shinn asserts that he is entitled to qualified immunity for implementing the policies regarding telephone access and packages because the law is not clearly established that Plaintiff has a right to unfettered access to call anyone or to receive packages from anyone, without any pre-approval requirements.

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis formerly required the court to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry." *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002). The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "qualified immunity inquiry" asks if the right was clearly established at the relevant time. *Id.* at 201-02.

The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v.*

*Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). For qualified immunity purposes, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

Plaintiff has not met his burden of showing that Defendant Shinn violated a clearly established right by implementing background checks for people that prisoners seek to call and people that want to send packages into the prison. Even if these restrictions resulted in a violation of Plaintiff's First Amendment rights, Plaintiff's failure to identify that the law is clearly established that such restrictions are unconstitutional is fatal to his individual capacity claim against Defendant Shinn. In implementing prison policies, Defendant Shinn cannot be liable for reasonable mistakes, and therefore, even if the restrictions violated Plaintiff's First Amendment rights, they were not clearly unlawful, and Defendant Shinn is entitled to qualified immunity to the extent Plaintiff sues Defendant Shinn in his individual capacity.

. . . .

. . . .

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 53).

(2) Defendants' Motion for Summary Judgment (Doc. 53) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 11th day of May, 2022.

_____
James A. Teilborg
Senior United States District Judge